**Jay V. BUSH, Plaintiff–Appellant,**

v.

**COMMONWEALTH EDISON COMPANY, Defendant–Appellee.**

**No. 92–2788.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1993.

Decided April 5, 1993.

Rehearing and Rehearing En Banc Denied May 10, 1993.*

* Hon. Walter J. Cummings took no part in the consideration of the suggestion for rehearing en banc.

Randall D. Schmidt, Mandel Legal Aid Clinic, Chicago, IL (argued) for plaintiff-appellant.

Linzey D. Jones, Jr., Glenn D. Newman (argued), Sidley & Austin, Chicago, IL, for defendant-appellee.

Before POSNER and MANION, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

POSNER, Circuit Judge.

The plaintiff in an employment discrimination case, a black man named Jay Bush, appeals from the grant of summary judgment in favor of his former employer, Commonwealth Edison Company. 778 F.Supp. 1436 (N.D.Ill.1991). The appeal presents issues under several statutes.

Commonwealth Edison hired Bush in 1978 as a repairman in the transportation department of Edison's Chicago South Division. For four years all went well. Then

in June 1982 Bush injured a knee while working and was placed on restricted duty for a couple of weeks. In December of the following year he reinjured the knee, and required surgery and extensive physical therapy. Edison imposed medical restrictions on him (such as no climbing or heavy lifting) that prevented him from performing the regular duties of his repairman's job. He was given light work to do in the department. After surgery and extensive physical therapy, he was able to resume almost all the duties required of a repairman. But after he balked at performing certain assigned tasks on the ground that they required more bending and kneeling than he could safely do, the company referred him to an orthopedic specialist who in July 1985 advised the company to place Bush in "a permanent sitting position." Concluding that Bush would never recover sufficiently to resume his repairman's work, Edison transferred him to a lower-paying clerical position (primarily involving filing) in the Customer Service Department of the Chicago South Division. This transfer was made shortly after and, Bush contends, because he had filed a workers' compensation claim against Edison (on which he eventually prevailed) in connection with the December 1983 reinjury of his knee, which Edison had contended was not a work-related accident.

Now begins a long tale of tardiness and absenteeism. Bush wanted to be a mechanic, not a file clerk. He had been in the Customer Service Department only two days when he took disability leave because of an automobile accident. Due to return on August 27, 1985, he called his supervisor the day before and asked to be allowed to come in late the next day because of a court appearance in the morning. He did not show up the next day at all, because the court appearance turned out to be in the afternoon. So his first day back from his disability leave was August 28—and he showed up late. Five days later he asked his supervisor for a day off to move his personal tools out of the Transportation Department. The supervisor arranged for the Transportation Department to move the tools so that Bush could work that day, but Bush refused to work despite his supervisor's warning that he would be disciplined. He was given a three-day suspension.

He returned to work, following the suspension, on September 9. Between then and November 4, he missed 19 days of work because of surgery on his injured knee, missed part of six other days because of physical therapy and court appearances, and was late for work on five days. On November 4 his supervisor warned him that he must improve or face further discipline. In the ensuing month, however, he missed nine days of work because of illness and court, and on December 4 he received a further warning.

January 1986 was uneventful, but between February 5 and March 6 Bush was late for work four times, was warned again, and on March 6 was suspended for five days for his overall record of absenteeism and tardiness and was warned that a failure to improve would "most likely" result in his being fired. Meanwhile he kept seeking unsuccessfully to return to the Transportation Department, but he refused Edison's offer to have his knee examined by one of the company's doctors. On July 3, Bush was late for work because of car trouble, and was again warned. August was uneventful but between September 4 and 23 Bush missed one day of work because of a court appearance and was late without excuse on four other days. On September 23, Edison fired him because, it says, of his "total record." He sought unemployment compensation on the ground that he had been fired in retaliation for filing the workers' compensation claim, but was turned down by the Illinois Department of Employment Security, which found that he had been fired for misconduct.

Bush claims that the company's actions in transferring him to the Customer Service Department (a demotion, because it paid a much lower wage), in refusing to retransfer him to the Transportation Department, and eventually in firing him

were due to his race and to his having filed a workers' compensation claim. We begin with the claim that he was fired because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Edison was entitled to summary judgment on that claim if, on the basis of the record that was before the district judge when he ruled on the motion for summary judgment, no finder of fact could reasonably have found that Bush, had he not been black, would not have been fired. There is no direct evidence that Edison discriminates against blacks, and Bush had an awful work record. In less than seven years of employment he missed 221 days of work because of injuries and illnesses, car problems, and court appearances arising out of traffic tickets and the automobile accident in which he was involved, and he was late to work on many other days. Many of these absences were not culpable, but a worker who for whatever reason does not show up for work regularly is not a satisfactory employee and is quite likely to be let go.

In these circumstances Bush had to show that although he was not a good employee, equally bad employees were treated more leniently by Edison if they happened not to be black. *Riordan v. Kempiners,* 831 F.2d 690, 697–98 (7th Cir.1987); *Shager v. Upjohn Co.,* 913 F.2d 398, 403 (7th Cir.1990). Bush's effort to make this showing is capsulized in a chart in his brief that compares his record with that of four other employees in the Customer Service Department, three white and one Hispanic. One of the whites was, like Bush, fired. The other two whites and the Hispanic were not, although, judging from the chart, their work records were even worse than `Bush's. However, the chart is misleading. It omits reference to many of Bush's absences and reprimands. And it arbitrarily excludes other employees who were retained, including a black man who remains in Edison's employ even though he has received ten suspensions, and other employees who were fired, including a white man who, like Bush, was fired after having been suspended only twice, although Edison's normal

practice is not to fire an employee until he has been suspended three times.

Of course a company cannot insulate itself from a finding of racial discrimination by pairing the firing of a black man with the firing of a white one, or by pointing to a token black whom it treated with abnormal leniency. But what is not permitted as a shield is not necessarily usable as a sword. A plaintiff cannot establish a prima facie case of racial discrimination by showing that, in a large department, a coworker of another race was treated more favorably than he, though other coworkers of his race were treated more favorably than other coworkers of other races. Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination. But that is all that Bush has.

We do not want to be misunderstood. Discriminating against blacks on one occasion, in one department, etc. is not cured by discriminating in their favor on another occasion, or in another department, etc. *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *Washington v. Electrical Joint Apprenticeship & Training Committee,* 845 F.2d 710, 713 (7th Cir.1988). To be free from discrimination is an individual rather than a group entitlement. But that principle is engaged only when there is evidence of discrimination apart from the fact that blacks sometimes are treated better than whites and sometimes worse. For that fact is not evidence of· discrimination at all. One would expect that an employer who did not discriminate on racial grounds, but who also did not adhere rigidly to his disciplinary rules and therefore sometimes fired workers after one or two suspensions though the norm was three, would treat some blacks more leniently than some whites and some blacks more harshly than some whites, as indeed would also be true if the employer did adhere rigidly to his disciplinary rules. It can be argued that failure to adhere to the rules opens the way to subjective determinations likely to reflect un-

conscious racial bias, but if so there would be evidence of systematic rather than random disfavoring of blacks. Had Bush's counsel examined the work records of a random sample of Bush's coworkers during the period of his employment and found a statistically significant disparity between blacks and whites with respect to Edison's departing from its disciplinary norms whether in the direction of severity or leniency, Bush would have established a prima facie case of racial discrimination. No such showing was attempted. The plaintiff's nonrandom collocation of truncated work records was met by the defendant's nonrandom counterinstances of blacks favored over whites. The result was a stand-off, revealing no racial pattern.

When a worker gives ample cause for discharge, as Bush did, his effort to defeat summary judgment by pointing to worse workers of a different race who were not fired is easily parried by pointing to instances of better workers of a different race who were also fired or worse workers of the plaintiff's race who were retained. The employer's parry can be parried in turn only with evidence, not here forthcoming, that the net effect was discriminatory.

■ Bush further claims that Edison's refusal to transfer him back to the Transportation Department when his personal physician pronounced his knee completely recovered was a refusal to make an employment contract with him, on account of his race, in violation of 42 U.S.C. § 1981. The only evidence is that a white coworker was allowed to transfer when he produced a similar statement from his physician. The district judge did not discuss the evidence, instead dismissing Bush's claim as barred by *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The Supreme Court held in that case that when a worker complains under section 1981 that his employer denied him a promotion on racial grounds, he must show that the promotion would have amounted to the creation of a new employment relation, as when an associate

in a law firm is promoted to partner. Bush was merely seeking a transfer from one division in the company to another. In both he would be paid a hourly wage, and though the wage in the Transportation Department would have been higher, that cannot be significant; otherwise every raise would be deemed the formation of a new contract. It is true that the two divisions were covered by separate collective bargaining agreements, and since collective bargaining agreements are employment contracts there is a sense in which, by changing divisions, Bush would have made a new employment contract. But it is a nominal sense. Edison has five collective bargaining agreements with seventeen locals of the International Brotherhood of Electrical Workers, but the locals do not bargain separately with Edison; they have formed a council to do the bargaining, and the collective bargaining agreements that the council made with Edison for the workers in the Consumer Service Department and the Transportation Department are materially identical. Workers who transfer between the departments retain their seniority, work records, benefits, etc.; probably most of them don't even know that they are changing collective bargaining agreements.

■ Bush's duties and wage changed, however, when he was transferred; and while this is true of many intracompany transfers, we suggested in *McKnight v. General Motors Corp.*, 908 F.2d 104, 109–110 (7th Cir.1990), the possibility of distinguishing between interdivisional transfers that are the consequence of normal job rotation within a company and those that might "count as the creation of a new employment relationship" because "the two divisions are unrelated and the employee's jobs in the divisions are significantly different." *Id.* at 110. We left open the question whether this functional interpretation of "new employment relationship," as distinct from an interpretation requiring different contractual terms of employment, was sound, and we need not try to answer the question today, or fit the facts of this case to it. The decisive point is that under *Patterson* the discharge of a worker on

racial grounds is not actionable; and demotions should be treated the same way. A worker who has been fired, demoted, or transferred should not be allowed to circumvent *Patterson* by seeking reinstatement, promotion, or retransfer and characterizing the employer's refusal as the refusal of a new contract. Bush's main complaint is that he was transferred out of the Transportation Department, and if that complaint is not actionable under *Patterson*, and it is not, then neither should his complaint that he was not allowed to transfer back to the department be actionable. Cf. *Dhaliwal v. Woods Division*, 930 F.2d 547 (7th Cir.1991). We so held with specific reference to a transfer designed not to demote but to get rid of an employee in *McKnight*, 908 F.2d at 110, and we think a similar logic applies to demotions.

Congress overruled *Patterson* in the Civil Rights Act of 1991 (see 42 U.S.C. § 1981(b)), but we have held that the Act (so far as bears on cases such as this) is not retroactive. *Luddington v. Indiana Bell Tel. Co.*, 966 F.2d 225 (7th Cir.1992); *Mozee v. American Commercial Marine Service Co.*, 963 F.2d 929, 932 (7th Cir.1992). The issue of retroactivity is currently before the full court in *Mojica v. Gannett Co.*, 986 F.2d 1158 (7th Cir.1993) (rehearing en banc granted March 4, 1993, in advance of the issuance of a panel opinion, 7th Cir.R. 40(f)), and before the Supreme Court in *Landgraf v. USI Film Products*, cert. granted, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993). Should the Act be. held retroactive, Bush can seek reinstatement of his section 1981 claim.

■ The remaining issues relate not to Bush's race, but to his knee injury. As a government contractor, Commonwealth Edison is subject to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which confers certain rights on disabled workers. The Act contains no statute of limitations, so the district judge had to borrow one. He borrowed the two-year statute of limitations applicable to personal injury suits in Illinois, Ill.Rev.Stat. ch. 110, ¶ 13–202, and having done so dismissed Bush's claim under the Rehabilitation Act as untimely.

The Supreme Court has held that in borrowing statutes of limitations for federal civil rights cases the courts should look to state statutes governing personal injury suits. *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985). The Rehabilitation Act, in forbidding discrimination against disabled employees, is closely akin to laws, which indisputably are civil rights laws, forbidding employment discrimination on grounds of race, sex, and age. Bush argues that his claim is basically a contract claim because founded on the contractual relation between Edison and the government, because the only relief he sought was contractual in nature (reinstatement and backpay), and because it is unclear whether tort-like damages are even available under the Rehabilitation Act. These arguments lead nowhere. The contract between Edison and the government confers jurisdiction, but is not the basis of Bush's claim; he relies on no provision of that contract. And right and remedy are distinct. Title VII confers an antidiscrimination right the contours of which are similar to those of outright constitutional tort statutes, such as section 1981, but did not (before its recent amendment) entitle the plaintiff to tort-like damages. *United States v. Burke*, —— U.S. ——, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992).

■ Last, Bush has a pendent claim for retaliatory discharge. He claims that Edison fired him for filing a workers' compensation claim. We need not decide the complicated issue, vigorously argued by the parties, whether the finding by the Illinois Department of Employment Security that Bush was fired for misconduct should bar him under the doctrine of collateral estoppel from trying to establish that the real reason he was fired was his having sued Edison. (Hence we deny Bush's motion to certify the question, which is one of Illinois state law, to the Supreme Court of Illinois.) He has failed to present sufficient evidence of retaliatory motive to withstand summary judgment. He filed the workers' compensation claim a year and a half before he was fired. The firing did not occur until he had compiled an impressive record of tardiness and absenteeism. It is of course possible that had he not filed the

workers' compensation claim the company would have been even more patient with him. But there is no evidence of this. His testimony that he heard his supervisor in the Transportation Department remark that "that son of a bitch is suing us" is no evidence, because when Bush was fired he had been working for another department for more than a year and the supervisor who made the remark in question had nothing to do with the decision to fire him. *Fortino v. Quasar Co.*, 950 F.2d 389, 395 (7th Cir.1991). Bush argues that his supervisors started picking on him as soon as he filed the workers' compensation claim, but the inference that Edison hatched an elaborate plot to get rid of him a year and a half after he filed his claim is too speculative to justify a rational finder of fact in concluding, in the face of the uncontested evidence discussed above, that, more likely than not, Bush would not have been fired had he not filed a workers' compensation claim.

The suit was properly dismissed on the company's motion for summary judgment.

AFFIRMED.