Frances LEE–PATTERSON, Plaintiff,

v.

**NEW JERSEY TRANSIT BUS OPERATIONS, INC., et al., Defendants.**

**Civil Action No. 94–5355 (AJL).**

United States District Court, D. New Jersey.

Feb. 20, 1997.

---

Arthur N. Martin, Jr., Newark, NJ, for Plaintiff.

Peter Verniero, Attorney General, Robert A. Shire, Deputy Attorney General, Newark, NJ, for Defendants.

LECHNER, District Judge.

This is an action[1] by Frances Lee–Patterson ("Patterson") against Frank Wilson ("Wilson"), Shirley DeLebrio ("DeLebrio"), Lou Wassong ("Wassong"), Linda McQuown[2] ("McQuown"), Ozetta Goodman ("Goodman"), David Woods ("Woods") and Elizabeth Schneider ("Schneider"), individually and in their official capacities (collectively, the "Individual Defendants"), and New Jersey Transit Bus Operations, Inc. (the "NJT") (collectively, the "Defendants").[3] Federal question jurisdiction is alleged, pursuant to 28 U.S.C. § 1343. Complaint, ¶ 1. Patterson alleges a cause of action, pursuant to 42 U.S.C. §§ 1983, 1985 and 1986, for violations of her rights under the First and Fourteenth Amendments to the United States Constitution. *Id.* Diversity jurisdiction is not alleged. Patterson additionally alleges a claim arising under State law. *See id.*, ¶ 54.

Currently pending is a motion for summary judgment filed by Defendants, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure (the "Motion for Summary Judgment")[4] For the reasons set forth below, the Motion for Summary Judgment is granted, in part. Patterson's Federal law claims are dismissed with prejudice and her State law claim is dismissed without prejudice.

*Facts*

A. *Parties*

Patterson was formerly employed by NJT as a telephone operator for Bus Operations in NJT's Transit Information Center (the "TIC"). Complaint, ¶ 2. NJT is a division of the New Jersey Transportation Authority Corporation, an agency operated by the State of New Jersey. *Id.* ¶ 3. At all relevant times, the Individual Defendants were NJT employees. Wilson was the Commissioner of the New Jersey Department of Transportation. *Id.*, ¶ 4. DeLebrio was the Executive Director of NJT. *Id.*, ¶ 6. Wassong was the Managing Director of Customer Service Bus Operations of NJT. *Id.*, ¶ 7. Goodman was Manager of NJT's Bus Customer Service Department. *Id.*, ¶ 15. McQuown and Woods were TIC supervisors. *Id.*, ¶ 8; Amended Complaint, ¶ 9. Schneider was the Director of NJT's Medical Department. Amended Complaint, ¶ 12.

B. *Background*

Patterson was hired by New Jersey Transit as a Telephone Operator in September 1987. Patterson Dep. at 43. At some point between 1988 and 1992, Patterson was fired

1. Patterson filed her complaint (the "Complaint") on 7 November 1994. On 17 November 1994, Patterson filed an amended complaint (the "Amended Complaint"). The Amended Complaint did not supersede the Complaint; the Amended Complaint merely supplemented the Complaint with the names and information regarding individual defendants who were indicated by fictitious names in the Complaint. Amended Complaint, *passim.* The Complaint and Amended Complaint were both filed *pro se;* Patterson subsequently retained the services of counsel.

2. McQuown is improperly designated in the Complaint as "McQewon." Woods, Schneider and Krayowski were designated in the Complaint by fictitious names, and were named in the Amended Complaint.

3. Patterson also alleged a cause of action against John Krayowski ("Krayowski") and Fred Wright ("Wright"). At all relevant times, Krayowski was the President and Wright was the Vice–President of the Amalgamated Transit Union, Division 819. Amended Complaint, ¶¶ 13–14. Patterson has dismissed, with prejudice, all claims against Amalgamated Transit Union, Division 819, Wright and Krayowski. *See* Consent Order for Dismissal, filed 19 August 1996.

4. Plaintiffs submitted: Brief in Opposition to Defendants' Motion for Summary Judgment (the "Opposition Brief"); Affidavit in Opposition to Defendants' Motion for Summary Judgment (the "Patterson Aff."); Statement Pursuant to Rule 12G of the General Rules for the District of New Jersey in Opposition to Defendants' Motion for Summary Judgment (the "Patterson 12G Statement").

Defendants submitted: Brief in Support of Motion for Summary Judgment (the "Moving Brief"), attaching exhibits; Affidavit of Elizabeth Schneider (the "Schneider Aff."), attaching exhibits; Affidavit of Ozetta Goodman (the "Goodman Aff."), attaching exhibits; Affidavit of Linda Corbalis–McQuown (the "McQuown Aff."), attaching exhibits; Statement Pursuant to Rule 12G of the General Rules for the District of New Jersey (the "Defendants 12G Statement"); Reply Brief.

by NJT for "not coming back after a leave of absence on time." *Id.* at 128. Patterson was rehired by NJT as a Telephone Operator on 12 August 1992. *Id.* at 128.

On or about 19 November 1993, Patterson was fired by NJT for violating a Drug and Alcohol Free Workplace Policy (the "Policy"), promulgated by NJT on 28 November 1989. Defendants 12G Statement, ¶ 1; *see* Policy, attached as Exh. F to Goodman Aff.; Patterson 12G Statement, ¶ 2. The stated purposes of the Policy were to provide "deterrence, detection, assistance, and enforcement" of drug and alcohol-related issues. Policy at 2. At all relevant times, the Policy prohibited NJT employees from having alcohol in their system while on duty. *Id.* at 2–3, 6; Defendants 12G Statement, ¶ 1–2. The Policy provided:

> As a condition of employment, all NJ Transit employees are prohibited from:
> a. Being impaired by or under the influence of a drug or alcohol while subject to, reporting for, or on duty, while in the workplace or while in recognizable NJ TRANSIT uniform. . . .
> d. *Drinking alcohol within four hours of reporting for duty or having alcohol in their system* while subject to, reporting for or on duty, while in the workplace or while in recognizable NJ TRANSIT uniform.

Policy at 6 (emphasis added).

Pursuant to the terms of the Policy, "[a]ll employees of [NJT were] required to submit to a urine analysis to detect the presence of controlled substances and/or a breath test to detect alcohol when a supervisory employee had *reasonable cause* to suspect that an on-duty employee [was] under the influence of, or impaired by the use of alcohol." Policy at 13 (emphasis added) The Policy provided, in pertinent part:

> Reasonable cause exists when a supervisory employee has a reasonable suspicion that an employee is currently under the influence of or impaired by alcohol . . . based on specific, personal observations

that the supervisory employee can articulate concerning the appearance, behavior, speech, or body odors of the employee. *Id.*

Pursuant to the Policy, "reasonable cause" testing of employees was limited to situations where two supervisory employees established reasonable suspicion. Policy at 14. Where the "suspected intoxication or impairment appear[ed] to result only from the use of alcohol, breath testing [was] the preferred means of confirmation." *Id.* at 14. Significantly, the Policy specifically provided "[a]n employee who tests positive for drugs or alcohol on a reasonable cause test *will be discharged.*" *Id.* at 13 (emphasis added). The Policy further provided that refusal to take an alcohol test was considered insubordination and was a ground for discharge of the recalcitrant employee. Policy at 32–33.[5]

At all relevant times, NJT provided employees experiencing alcohol or drug problems with an in-house Employee Assistance Program ("EAP"). Policy at 27. The EAP offered therapy, rehabilitation and counseling. *Id.* NJT employees were offered entrance into the EAP on either a voluntary or mandatory basis. *Id.* at 27–28. Voluntary EAP participation "afford[ed] employees affected by alcohol or drug use problems the opportunity to maintain an employment relationship with the company if, before the employee ha[d] engaged in conduct deemed by NJ TRANSIT sufficient to warrant discipline, the employee voluntarily [sought] assistance from the company . . . or [was] referred for such assistance by a supervisor, by another employee or by a representative of the employee's collective bargaining unit." *Id.*

At all relevant times, mandatory EAP participation was available to NJT employees who tested positive for alcohol or drugs in connection with a pre-employment test, as part of a physical examination, in a post-accident test, in a random or unannounced

---

5. The Policy provided:

    Any employee who refuses to cooperate with collection and testing or who tests positive on any drug or alcohol test will be immediately removed from duty and, in the case of a positive drug test, will be provided with a copy of the report of the test results and notice of the basis for the removal not later than the time of removal.

    Policy at 23.

test,[6] in an unannounced follow-up test following a negative retest or in connection with return to duty following voluntary EAP participation. Policy at 28. Significantly, the Policy did not provide for either voluntary or mandatory EAP participation following a "reasonable cause" alcohol test. *Id.*

On 19 November 1993, Patterson attended a funeral and repast during which she consumed several glasses of punch containing alcohol. Patterson Aff., ¶ 2; Defendants 12G Statement, ¶ 8. Patterson states she was not aware the punch contained alcohol and that she later learned the punch had been "spiked." Patterson Aff., ¶ 3. Patterson left the repast and reported for work at 3:30 p.m. *Id.;* Defendants 12G Statement, ¶ 7. While working at her desk, Patterson was approached by McQuown, who asked her a question concerning NJT's new computer system. Patterson Aff., ¶ 5. Patterson states she did not immediately respond to McQuown's inquiry because she was eating. *Id.*

Between ten and fifteen minutes later, Schneider and McQuown approached Patterson. Patterson Aff., ¶ 6; Defendants 12G Statement, ¶ 11. Schneider asked Patterson how many drinks she had consumed. Patterson Aff., ¶ 6. Patterson denied having any drinks. *Id.* Schneider and McQuown then brought Patterson to NJT's Medical Department and informed her they believed she was under the influence of alcohol. Defendants 12G Statement, ¶ 12. Schneider states it was decided to administer a "reasonable cause" test for alcohol because:

a. [Patterson's] speech was rambling and incoherent;

b. [Patterson's] demeanor was variously "fighting and excited" and "giddy and inappropriate laughing (sic);"

c. [Patterson's] pupils were sluggish in reacting to light (when I held a penlight before her eyes in a darkened room her pupils were slow to contract and only contracted to about 2cm. instead of the normal 1cm.);

d. [Patterson] had the smell of alcohol on her breath;

e. [Patterson] admitted drinking at a funeral as late as 3:15 p.m. that day, prior to coming to work at 3:35 p.m., and knew the punch she drank "had something in it" (although she changed her story and stated later that day that she didn't know that the punch at the funeral had been "spiked.")

Schneider, Aff., ¶ 5; *see* Observer Report (the "Observer Report"), attached to Schneider Aff. as Exh. C; Witness Report (the "Witness Report"), attached to Schneider Aff. as Exh. D.

In accordance with the Policy, Schneider proceeded to administer two breath alcohol tests to Patterson.[7] Defendants 12G Statement, ¶ 16; Schneider Aff., ¶ 4. The initial test yielded a result of .066; the subsequent test yielded a result of .059.[8] Schneider Aff., ¶ 4, Exhibits A, B. McQuown then filed a disciplinary charge against Patterson and informed her, pursuant to the NJT contractual grievance procedure, that an in-house disciplinary hearing would be held on 23 November 1993 (the "23 November 1993 Hearing"). Patterson Aff., ¶ 10; McQuown Aff., ¶¶ 2–3.

At the 23 November 1993 Hearing, Goodman terminated Patterson. Patterson Aff., ¶ 11. Goodman based her decision upon the breath alcohol test results and accompanying reports provided by Schneider and McQuown. Goodman Aff., ¶¶ 2–3; McQuown Aff., ¶ 3. Goodman states she reviewed the Policy, and "[h]aving no authority to do otherwise, [she] discharged ... Patterson as mandated by the [P]olicy." Goodman Aff., ¶ 3.

At the 23 November 1993 Hearing, Goodman denied a union representative's request

---

6. Random and unannounced drug testing were performed on employees engaged in "Safety Sensitive Positions". Policy at 12. A list of Safety Sensitive Positions does not include Patterson's position as telephone operator. *See id.,* Exhibit I.

7. Patterson alleges she initially refused to take the breath test, but later acquiesced when two police officers refused to let her leave the room. Patterson Aff., ¶ 8.

8. The facts are not in dispute as to the administration of the test or the reliability of the instrumentation.

that Patterson be considered for the EAP. McQuown Aff., ¶ 3; *see* Goodman Aff., ¶ 3. Goodman responded to the request stating there was nothing in the Policy permitting entrance into the EAP for an employee who tested positive on a reasonable cause test. McQuown Aff., ¶ 3; *see* Goodman Aff., ¶ 3. Patterson states she similarly requested placement in the EAP, which Goodman denied. Patterson Aff., ¶ 12.

### C. *The Complaint*

As indicated, Patterson filed the Complaint on 7 November 1994. Patterson alleges her termination, as well as the decision to deny her placement in the EAP, was in retaliation for her decision to testify in a race discrimination suit against NJT and Goodman (the "Discrimination Action"). Complaint, ¶ 30–31. The Discrimination Action, which was brought by one of Patterson's co-workers, alleged NJT had engaged in racially discriminatory practices. *Id.*, ¶ 32.

Patterson alleges NJT management conspired to thwart the attempts of TIC personnel to support the Discrimination Action. Complaint, ¶¶ 32–34. Patterson alleges Goodman engaged "in a course of conduct designed to embarrass, humiliate, and cause [her] discharge...." *Id.*, ¶ 38. Patterson further alleges Defendants "conspired by force, intimidation and threats" to dissuade her from testifying in the Discrimination Action, as well as to ultimately terminate her. *Id.*, ¶ 53.

Patterson alleges her Fourteenth Amendment rights were violated when

> she was discharged from the employment of [NJT] for reporting to work intoxicated, but never received copy (sic) of [the Policy] that would of advised against reporting to work within four hours while alcohol was still in system (sic)

Complaint, ¶ 51.

As indicated, Patterson additionally alleges a claim arising under State law. Specifically, Patterson "alleges that [D]efendants violated the [S]tate law against unlawful **conspiracies** and the regulations of New Jersey Transit Corporation with respect to conspiring to cause the wrongful termination of a person

from his/her employment." Complaint, ¶ 55 (emphasis in original). Patterson alleges NJT "through its authorized agents and employees, breached [her alleged] employment contract ... by failing to follow the procedures for discharge ... set forth in [the Policy] ... **even though the discharge may have been for good cause....**" *Id.*, ¶ 23 (emphasis in original).

The Complaint seeks a declaratory judgment that "defendants violated the United States Constitution and [S]tate law ...." Complaint, *ad damnum* clause, ¶ (A). Patterson seeks an order reinstating her to her former position and granting her back pay and benefits. *Id.*, ¶ (B). Patterson additionally seeks compensatory and punitive damages against Defendants. *Id.*, ¶ (C). Finally, Patterson seeks "such other relief as it may appear [she] is entitled." *Id.*, ¶ (E).

### D. *The Discrimination Action*

As indicated, Patterson alleges she was fired for her support of the Discrimination Action. Complaint, ¶ 30. The Discrimination Action concerned events which occurred in 1988. Patterson Dep. at 131. The Discrimination Action was captioned: *Jean–Pierre v. N.J. Transit,* Civil Action Number 90–4364(MTB). The complaint in the Discrimination Action was filed on 1 November 1990. The Discrimination Action was reported as settled and was dismissed on 14 April 1994.

Patterson states she became aware of the events giving rise to the Discrimination Action as early as 1988 and that she made her decision to support the Discrimination Action at that time. Patterson Dep. at 135. Significantly, Patterson states Goodman became aware of her decision to testify in support of the Discrimination Action in either 1988 or 1989. *Id.* at 134–42. Patterson filed, with the Complaint, a subpoena directing her to appear in court on 26 July 1993 to testify in the Discrimination Action. Patterson, however, did not testify in the Discrimination Action; as indicated, the Discrimination Action was dismissed in 1994, as settled.

At all relevant times, Schneider was not aware of Patterson's support for the Discrimination Action. Schneider Aff., ¶ 7; *see* Pat-

terson Dep. at 195. Patterson concedes she has no information Wilson was aware of her support for the Discrimination Action. Patterson Dep. at 185. Patterson, moreover, does not respond to Defendants' argument that there is no evidence that any of the Individual Defendants, with the exception of Goodman, had knowledge of Patterson's support for the Discrimination Action. *See* Opposition Brief.

*Discussion*

A. *Summary Judgment Standard of Review*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Witco Corp. v. Beekhuis,* 38 F.3d 682, 686 (3d Cir.1994). The present task is to determine whether genuine issues of material fact exist and whether Defendants are entitled to judgment. A district court, however, may not resolve factual disputes on a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir. 1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' ") (quoting *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ...

against the moving party"), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. *See Di-Biase v. SmithKline Beecham Corp.,* 48 F.3d 719, 724 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("summary judgment is proper where the facts are undisputed"), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert v. United States,* 925 F.Supp. 261, 265 (D.N.J.1996).

In addition, where the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Once the movant demonstrates an essential element of the nonmovant's case is lacking, the nonmovant must come forward with sufficient evidence to demonstrate there is a factual controversy as to that element. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10; *Siegel Transfer Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Witco,* 38 F.3d at 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *accord Siegel,* 54 F.3d at 1130–31; *Nevets C.M. Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 534 (D.N.J.1989), *aff'd without Op'n,* 899 F.2d 1218 (3d Cir.1990).

If the nonmovant fails to make a sufficient showing regarding an essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2551–52; *Siegel,* 54 F.3d at

1130–31; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

### B. *Section 1983*

42 U.S.C. § 1983 ("Section 1983") provides a cause of action against a person "who, under the color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Id.* The purpose of Section 1983 is "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254–57, 98 S.Ct. 1042, 1047–49, 55 L.Ed.2d 252 (1978)); *see also Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 265 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995); *Bolden v. SEPTA*, 21 F.3d 29, 34 (3d Cir.1994).

To state a claim under Section 1983, Patterson must allege (1) conduct committed by a person acting under color of state law, and (2) that this conduct deprived her of "rights, privileges, or immunities secured by the Constitution and laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 662–63, 88 L.Ed.2d 662 (1986); *see West v. Atkins*, 487 U.S. 42, 48–49, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978); *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir.1993); *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1141–42 (3d Cir.1990).

### 1. *Respondeat Superior*

■ Patterson's claims against NJT are dismissed to the extent they are based upon a theory of vicarious liability for the actions of the Individual Defendants. A Section 1983 action cannot be predicated upon a theory of vicarious liability such as *respondeat superior. Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 738, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989); *West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988); *Polk County v. Dodson*, 454 U.S. 312, 325, 102 S.Ct. 445, 453–54, 70 L.Ed.2d 509 (1981); *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode*, 423 U.S. 362, 370–77, 96 S.Ct. 598, 603–07, 46 L.Ed.2d 561 (1976).

A government entity may be held liable under Section 1983 only upon a showing of its "deliberate indifference" to the Constitutional rights of the plaintiff. *Canton*, 489 U.S. at 388, 109 S.Ct. at 1204–05. The "deliberate indifference" standard is consistent with the Supreme Court's admonition that governmental units "can be liable under [Section] 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *Id.* at 389, 109 S.Ct. at 1205; *see also Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981). Only where there is a showing of deliberate indifference can the defect be attributed to a governmental entity's policy or custom. *Id.*

A "high degree of fault [must be shown] on the part of [government] officials before an omission that is not in itself unconstitutional can support liability as [government] policy under *Monell*." *Canton*, 489 U.S. at 396, 109 S.Ct. at 1208–09 (O'Connor, J., concurring). Accordingly, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability. . . ." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985). "To adopt lesser standards of fault and causation would open [governmental units] to unprecedented liability under [Section] 1983." *Canton*, 489 U.S. at 391, 109 S.Ct. at 1206.

A plaintiff must meet two burdens before the "deliberate indifference" standard is applied to his or her Section 1983 claim. A plaintiff has the burden of showing (1) the

existence of an official policy or custom, and (2) the official policy or custom "caused a constitutional tort." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036.

A government "[p]olicy is made when a 'decisionmaker possess[ing] final authority to establish [government] policy with respect to the action' issues an official proclamation, policy or edict." *Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir.1996) (citing *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990))). A government custom, "on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.; see also Andrews,* 895 F.2d at 1480; *Fletcher v. O'Donnell,* 867 F.2d 791, 793–94 (3d Cir.), *cert. denied,* 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989). Depending upon the alleged claim, a plaintiff must demonstrate that a particular policymaker is responsible for creating the policy or acquiescing to the custom. A prerequisite to establishing liability is a showing that a policymaker was responsible either for the policy or, through acquiescence, for the custom. *Andrews,* 895 F.2d at 1480; *see also Jett,* 491 U.S. at 737, 109 S.Ct. at 2723–24; *Kneipp,* 95 F.3d at 1212; *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990).

"[P]roof of the mere existence of an unlawful policy or custom is not enough to maintain a [Section] 1983 action. A plaintiff bears the additional burden of proving that the practice was the proximate cause of the injuries suffered." *Bielevicz,* 915 F.2d at 850 (citing *Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir.1984)). To establish proximate cause, plaintiff must show an "affirmative link" or "plausible nexus" between, respectively, the policy or custom alleged and the injury to the constitutional rights. *Id.* at 850–851; *see Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436; *Estate of Bailey,* 768 F.2d at 507.

Patterson has failed to meet her burden. Patterson has produced no evidence which would indicate NJT has an "official policy or custom" of retaliation for protected activity. Patterson, moreover, has not shown NJT has engaged in a "course of conduct" of retaliation. Finally, Patterson has failed to even allege or argue deliberate indifference on the part of NJT. Accordingly, Patterson's Federal law claims against NJT are dismissed.

C. *Patterson's Claims Against the Individual Defendants Pursuant to the First and Fourteenth Amendments*

■ As indicated, Patterson alleges Defendants' actions violated her rights under the First and Fourteenth Amendments to the United States Constitution. Complaint, ¶ 45. The Due Process Clause of the Fourteenth Amendment provides three distinct types of Constitutional protection. "First, the Clause incorporates many of the specific protections defined in the Bill of Rights.... Second, the Due Process Clause contains a substantive component that bars certain arbitrary wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990). Third, the Due Process Clause contains a procedural component that protects against the "deprivation by state action of a constitutionally protected interest in 'life liberty or property' ... without due process of law." *Id.* (quoting *Parratt,* 451 U.S. at 537, 101 S.Ct. at 1913–14; emphasis in original omitted).[9]

---

9. As indicated, Patterson alleges her due process rights under the Fourteenth Amendment were violated because she had not been provided with a copy of the Policy, which, among other things, forbad reporting for work while intoxicated. Complaint, ¶ 51. Patterson's due process claim is without merit. Patterson has neither alleged nor has argued that she had a protected property interest, within the meaning of the Fourteenth Amendment, in her former position with NJT. Accordingly, her due process claim fails. *See*

*Robertson v. Fiore,* 62 F.3d 596, 601 (3d Cir. 1995); *De Tore v. Local # 245 of the Jersey City Public Emp. Union,* 615 F.2d 980, 984–85 (3d Cir.1980).

Assuming that Patterson possessed a protected property interest in her job, her allegations do not appear to state a due process claim. Aside from her conclusory allegations, Patterson has not shown how NJT's alleged failure to provide her with a copy of the Policy could violate her due process rights.

■ Patterson alleges Defendants violated her First and Fourteenth Amendment Rights by terminating her in retaliation for her testimony in the Discrimination Action.[10] Complaint, ¶ 45. In order for a plaintiff to establish a prima facie case of retaliatory discharge, the employee must show (1) her conduct was "constitutionally protected;" and (2) her conduct was a "substantial factor" or a "motivating factor" in the adverse employment decision. *Mt. Healthy City School District Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *see Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir.1996); *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3d Cir.1995); *Bradley v. Pittsburgh Bd. of Ed.*, 913 F.2d 1064, 1074–75 (3d Cir.1990); *Monsanto v. Quinn*, 674 F.2d 990, 999–1000 (3d Cir.1982); *Trotman v. Board of Trustees of Lincoln Univ.*, 635 F.2d 216, 224 (3d Cir.1980), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981); *Raniero v. Antun*, 943 F.Supp. 413, 422 (D.N.J.1996).

If Patterson meets her burden, Defendants are given the opportunity to show by a "preponderance of the evidence" they would have reached the same decision in the absence of the protected conduct. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576; *Pro*, 81 F.3d at 1288; *Watters*, 55 F.3d at 892; *Trotman*, 635 F.2d at 224.

### 1. Constitutionally Protected Activity

In the first step of the retaliatory discharge analysis, Patterson must demonstrate her conduct was constitutionally protected. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. A state actor cannot lawfully terminate an employee for "reasons that infringe upon that employee's constitutionally protected interest in freedom of speech." *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823 (3d Cir.1994). To determine if an employee has engaged in protected free speech, the court must consider whether the speech "can fairly be characterized as constituting speech on a matter of public concern." *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993) (citing *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Zamboni v. Stamler*, 847 F.2d 73, 77 (3d Cir.1988); *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir. 1983); *Lees v. West Greene School District*, 632 F.Supp. 1327, 1330 (W.D.Pa.1986)). The employee's speech may address a matter of public concern "when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.' " *Holder*, 987 F.2d at 195 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90; *Johnson v. Lincoln Univ. of Com.*, 776 F.2d 443, 451 (3d Cir.1985)). The court should review the "content, form, and context" of the speech to determine if the speech can be connected to political or social concern of the community. *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91.

The next step in the analysis is to weigh the employee's interest in free speech "against the government's interest in promoting efficiency among its employees." *Feldman*, 43 F.3d at 829 (citing *Versarge v. Township of Clinton New Jersey*, 984 F.2d 1359, 1364 (3d Cir.1993)). The balancing test

---

**10.** Patterson has not alleged a violation of the New Jersey Law against Discrimination, N.J.Stat.Ann. §§ 10:5–1 *et. seq.* (the "NJLAD"). A claim under NJLAD would similarly fail. In order for Patterson to establish a prima facie case of retaliatory discharge under NJLAD, she must show "by a preponderance of the evidence that (1) ... she 'engaged in a protected activity known to the employer;' (2) ... she thereafter was 'subjected to [an] adverse employment decision by the employer;' and (3) there was a 'causal link' between the protected activity and adverse employment decision." *Delli Santi v. CNA Insurance Companies*, 88 F.3d 192, 198 (3d Cir.1996) (citations omitted). For reasons discussed in this opinion, if alleged, Patterson would not establish the requisite causal link between her testimony and the discharge. *Id.*

Patterson has likewise not alleged a cause of action under Title VII of the Civil Rights Act of 1964 (Title VII). "Section 704(a) of Title VII ... makes it unlawful 'for an employer to discriminate against any of his [or her] employees or applicants for employment' who have either availed themselves of Title VII's protections or assisted others in so doing." *Robinson v. Shell Oil Co.*, —— U.S. ——, ——, 117 S.Ct. 843, 844–45, 136 L.Ed.2d 808 (1997) (quoting 42 U.S.C. § 2000e–3(a)). As indicated, the Complaint contains no claim pursuant to Title VII and it appears that Patterson has not filed a charge with the Equal Employment Opportunity Commission.

developed in *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), involves a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734–35.

■ In the instant case, it appears Patterson has asserted sufficient facts to show that, by supporting the Discrimination Action, she was engaging in protected speech activity. Patterson's interest in exposing alleged discriminatory practices at NJT is important. *See, e.g., Swineford v. Snyder County*, 15 F.3d 1258, 1274 (3d Cir.1994) ("Speech involving government impropriety occupies the highest rung of First Amendment protection."). Additionally, matters of alleged discrimination in the workplace are strong public concerns. With regard to balancing Patterson's interest in exposing alleged discrimination with NJT's interest in operating an efficient workplace, it does not appear Patterson's activities interfered with NJT's operations.

### 2. *Unconstitutional Discharge*

In the second step of the retaliatory discharge analysis, Patterson must show that her decision to testify against NJT was a "substantial factor" or a "motivating factor" in the decision to terminate her. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576; *Raniero*, 943 F.Supp. at 422. Patterson has failed to meet her burden. As indicated, Patterson has adduced no evidence Wilson, DeLebrio, Schneider, Wassong or Wood had any knowledge of Patterson's support for the Discrimination Action.

Patterson has only demonstrated Goodman was aware of Patterson's support for the Discrimination Action. Defendants 12G Statement, ¶ 24. Significantly, Schneider, the medical director who, along with McQuown, made the determination that reasonable cause existed to conduct the breath test on Patterson, stated that she had no knowledge of Patterson's alleged testimony at the time she made the "reasonable cause" determination. Schneider Aff., ¶ 7.

As indicated, the events giving rise to the Discrimination Action occurred in 1988 or 1989. Patterson Dep. at 135. Significantly, although the Discrimination Action was not filed until 1990, Patterson states Goodman was aware of her decision to support the Discrimination Action and to testify against NJT as early as 1988. *Id.* at 135–36.

Goodman's knowledge of Patterson's decision to support the Discrimination Action for four or five years is not consistent with a conclusion that Patterson was fired because of her protected activity. *See, e.g., Bush v. Commonwealth Edison Co.*, 990 F.2d 928 (7th Cir.1993), *cert. denied*, 511 U.S. 1071, 114 S.Ct. 1648, 128 L.Ed.2d 367 (1994). In *Bush*, the employee alleged that his termination was in retaliation for a worker's compensation claim filed a year and a half before he was fired. *Id.* at 933. The court held the inference that the employer "hatched an elaborate plot to get rid of [the employee] a year and a half after he filed his claim is too speculative to justify a rational finder of fact in concluding … that, more likely than not, [the employee] would not have been fired had he not filed [the claim]." *Id.* at 934; compare *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.) (a showing of discharge "soon after" protected activity is indirect proof of requisite causal connection), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987) with *Oliver v. Digital Equipment Corp.*, 846 F.2d 103 (1st Cir.1988) (two year gap between protected activity and termination insufficient to support claim for retaliatory discharge); *see also San Filippo v. Bongiovanni*, 30 F.3d 424, 444 (3d Cir.1994) (six year gap not too far removed in time where plaintiff engages in subsequent protected activity and plaintiff is dismissed shortly after the final episode of protected activity), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995).

■ In the instant case, Goodman was aware of Patterson's support for the Discrimination Action four or five years before Patterson was discharged. Apparently, moreover, Patterson had been rehired by NJT after Goodman became aware of her support for the Discrimination Action.

Goodman did not make the "reasonable cause" determination that Patterson appeared to be under the influence of alcohol and was not involved in administering the breath alcohol test to Patterson. As indicated, Schneider, who administered the breath alcohol test, was not aware of Goodman's support for the Discrimination Action.

The Policy, which had been in effect since 1989, did not provide for placement of employees who tested positive on a "reasonable cause" drug or alcohol test in the EAP Program. Instead, the Policy specifically directed that such employees be discharged.

Patterson has failed to demonstrate her support for the Discrimination Action was a substantial or motivating factor in her discharge. *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576; *see also Hom v. Squire*, 81 F.3d 969, 974 (10th Cir.1996) (plaintiff's affidavit stating his belief he was discharged because of his exercise of his First Amendment rights was insufficient to establish a causal connection between his "speech" and his subsequent discharge); *Finnegan v. Board of Ed. of Troy*, 30 F.3d 273, 274 (2d Cir.1994) (plaintiff's "conclusory allegations and his own opinion" were "insufficient to create a genuine issue to be tried"). Accordingly, Patterson has failed to present a *prima facie* case of retaliatory discharge. Patterson has produced no evidence which would support a finding that NJT terminated Patterson in 1993 based on protected activity stemming from 1988 or 1989. Accordingly, Patterson's claim for retaliatory discharge is denied.

Even assuming, *arguendo*, that Patterson was able to establish a *prima facie* case of retaliatory discharge, her claim would still fail because it is uncontested that Patterson was intoxicated at work and the Policy mandated her dismissal. *See Mt. Healthy*, 429

U.S. at 287, 97 S.Ct. at 576. Accordingly, regardless of her alleged discriminatory animus toward Patterson, Goodman was required to discharge Patterson.

The Policy explicitly states that "[a]n employee who tests positive for drugs or alcohol on a reasonable cause test *will be discharged."* Policy at 13. (emphasis added). Patterson does not argue she was not intoxicated. Complaint, ¶ 23–25; Patterson Aff., ¶ 2. Similarly, Patterson does not challenge the method of or results obtained by the breath test. Patterson Aff., ¶ 7–9.

■ In accordance with the Policy, both Schneider and McQuown had "reasonable cause" to suspect Patterson was under the influence of alcohol. *See* Observer Report; *see also* Witness Report. Schneider was able to articulate "specific, personal observations ... concerning [Patterson's] appearance, behavior, speech, [and] body odor[ ]." *See id.; see also* Policy at 13. Based upon these observations, Patterson was required to undergo two separate breath tests, both of which she failed. Schneider Aff., ¶ 4; Defendants 12G Statement, ¶ 18. Following a disciplinary hearing, Patterson was terminated pursuant to the express terms of the Policy. Patterson Aff., ¶ 11. Accordingly, NJT's decision to terminate Patterson was legitimate and nondiscriminatory.

### D. *Claims Under Sections 1985 and 1986.*

#### 1. *Section 1985*

■ Section 1985 [11] was enacted to provide a cause of action for individuals deprived of their federal rights by conspiracies. *Rogin v. Bensalem Township.*, 616 F.2d 680, 696 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). The pro-

---

**11.** Section 1985 provides, in pertinent part:

"If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely fully, or truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or ... if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of

justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws ... the party so injured may have an action for the recovery of damages occasioned by such injury or deprivation, against one or more of the conspirators."

42 U.S.C. § 1985.

visions of the statute encompass private conspiracies as well as actions under color of state law. *See Griffin v. Breckenridge,* 403 U.S. 88, 101, 91 S.Ct. 1790, 1797–98, 29 L.Ed.2d 338 (1971).

■ In order to state a claim under Section 1985, the plaintiff must allege a conspiracy, motivated by a discriminatory based animus, for the purpose of depriving any person or class of the equal protection of the law and an act in furtherance of the conspiracy, whereby a person is injured. *United Brotherhood of Carpenters & Joiners Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–57, 77 L.Ed.2d 1049 (1983); *Hobson v. Wilson,* 737 F.2d 1, 14 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *see also Burt v. Ferrese,* 871 F.2d 14, 17 (3d Cir.1989); *Robison v. Canterbury Village. Inc.,* 848 F.2d 424, 425 (3d Cir.1988).

■ The requirement that the conspiracy be motivated by class-based animus was added by the Supreme Court in *Griffin. See* 403 U.S. at 102, 91 S.Ct. at 1798. The Court held that in order to give "full effect" to the Congressional purpose of Section 1985, "there must be some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Id.* Accordingly, Section 1985 "does not apply to all conspiratorial tortious interference with the rights of others, but only to those motivated by some class-based, invidiously discriminatory animus." *Hobson,* 737 F.2d at 14; *see also Burt,* 871 F.2d at 17; *Robison,* 848 F.2d at 425.

■ There are insufficient factual allegations by Patterson to support a claim of conspiracy motivated by class-based, discriminatory animus. Patterson has alleged no such conduct on the part of Defendants. Patterson, moreover, does not respond to Defendants' arguments on this point. *See* Opposition Brief. As indicated, moreover, there is no indication that any of the Individual Defendants, with the exception of Goodman, knew of Patterson's decision to support the Discrimination Action. Consequently, Patterson fails to state a claim against Defendants pursuant to 42 U.S.C. § 1985.

2. *Section 1986*

Section 1986 [12] does not create an independent cause of action. *Black v. Bayer,* 672 F.2d 309, 312–13 n. 4 (3d Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982). Because Section 1986 claims are derived from Section 1985 claims, so that "plaintiff's [Section] 1986 claim would fail with [her] [Section] 1985 claim," if she has not stated a claim under Section 1985. Because Patterson fails to state a claim against the Defendants under Section 1985, her Section 1986 claim also fails. *See Black,* 672 F.2d at 312–13 n. 4.

E. *State Law Claim*

As indicated, Patterson has asserted Federal jurisdiction over Defendants, pursuant to 28 U.S.C. § 1343. Patterson has also alleged supplemental jurisdiction over her state law claim,[13] pursuant to 28 U.S.C. § 1367.

Supplemental jurisdiction enables federal courts to hear state law claims over which

**12.** Section 1986 provides:

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such

wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."
42 U.S.C. § 1986.

**13.** As indicated, Patterson alleges "[D]efendants violated the state law against unlawful conspiracies and the regulations of [NJT] with respect to

there is no independent basis of jurisdiction. 28 U.S.C. § 1367; *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349, 108 S.Ct. 614, 618–19, 98 L.Ed.2d 720 (1988). Supplemental jurisdiction depends upon the existence of subject matter jurisdiction over other claims in the action. Pursuant to 28 U.S.C. § 1367, the "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy...." 28 U.S.C. § 1367(a); *see also Sinclair v, Soniform, Inc.*, 935 F.2d 599, 603 (3d Cir.1991).

Section 1367(c) permits a court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Carnegie–Mellon*, 484 U.S. at 350, 108 S.Ct. at 619 ("when the [F]ederal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the [F]ederal court should decline the exercise of jurisdiction by dismissing the case without prejudice.") (footnote omitted); *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 198 n. 3 (3d Cir.1991) (dismissal of "pendent state law claim[ ]" proper where federal claims dismissed for lack of subject matter jurisdiction)

As discussed, the claims raised against the Defendants pursuant to 42 U.S.C. §§ 1983, 1985 and 1986 have been dismissed. Because no other ground for supplemental jurisdiction is alleged, the remaining claim is dismissed without prejudice. 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

*Conclusion*

For the reasons set forth above, the Motion for Summary Judgment is granted, in part. Patterson's Federal claims are dismissed with prejudice and her State law claim is dismissed without prejudice.

conspiring to cause the wrongful termination of [Patterson] from ... her employment:" Complaint, ¶ 55 (emphasis in original).