**NEW JERSEY FREEDOM ORGANIZATION and New Brunswick Coalition Against Police Brutality, Plaintiffs,**

v.

**CITY OF NEW BRUNSWICK, James Cahill, individually and as Mayor of the City of New Brunswick, City Council of the City of New Brunswick and Michael Beltranena, individually and as Chief of Police of the City of New Brunswick, Defendants.**

No. CIV. A. 97–586 AJL.

United States District Court, D. New Jersey.

Dec. 15, 1997.

Jeffrey E. Fogel, Nutley, NJ, for Plaintiffs.

William Hamilton, Jr., T.K. Shamy, New Brunswick, NJ, for Defendant.

## OPINION

LECHNER, District Judge.

This case concerns the validity, under the First Amendment to the United States Constitution, of a city ordinance which requires a permit for any event at which fifty or more people are expected to attend, and at which admission is charged or a contribution is solicited. The New Jersey Freedom Organization and the New Brunswick Coalition Against Police Brutality (collectively, the "Plaintiffs") bring this action against the City of New Brunswick ("New Brunswick"), James Cahill individually and as Mayor of the City of New Brunswick (the "Mayor"), the City Council of New Brunswick (the "City Council"), and Michael Beltranena individually and as the Chief of Police of the City of New Brunswick ("Beltranena") (collectively, the "Defendants").

This action was commenced on 5 February 1997 with the filing of a three-count complaint (the "Complaint"). The first count ("Count One") and second count ("Count Two") alleged violations of the First and Fourteenth Amendments to the United States Constitution (the "Constitution"). The third count ("Count Three") alleged violations of the New Jersey Constitution (the "New Jersey Constitution"). Plaintiffs filed a motion for summary judgment (the "Plaintiffs' Motion for Summary Judgment"), and Defendants filed a cross-motion for summary judgment (the "Defendants' Motion for Summary Judgment").[1]

For the reasons set forth below, the Plaintiffs' Motion for Summary Judgment is granted and the Defendants' Motion for Summary Judgment is denied.

*Facts*

On 2 October 1996, the City Council adopted Ordinance No. 00996–4 (the "Party Permit Ordinance"). *See* Plaintiffs' Brief at 2. On 7 October 1996, the Party Permit Ordi-

nance was signed by the Mayor of New Brunswick. *See* Defendants' Brief at 1. On 22 October 1996, the Party Permit Ordinance became effective. *See id.*

1. *The Party Permit Ordinance*

The purpose and intent of the Party Permit Ordinance are described in Section II:

1. The noise, congregations, etc. frequently associated with parties, festivals or other similar events whereby large gatherings of people assemble often lead to fighting, boisterous behavior, and other disturbances which otherwise adversely affect the quality of life in [New Brunswick] neighborhoods and

2. The establishment of a party permit system imposed on the organizers of such large gatherings under certain circumstances may provide a mechanism by which the above described problems may be abated and would generally promote the public health, safety, and welfare of the residents of [New Brunswick].

Party Permit Ordinance, § II, attached to Fogel Decl., Exhibit A.

Section III specifies which organizations are affected by the Party Permit Ordinance:

No person, corporation, partnership or other similar entity engaged planning [sic], sponsoring or otherwise organizing a party, a festival, or other similar event ... involving an anticipated gathering of fifty (50) or more persons for which an admission charge is collected or during which event a contribution is collected or solicited for any purpose, shall hold any event without first applying for a ... "party permit" and obtaining the party permit from the City Clerk.

Party Permit Ordinance, § III(a).[2]

In order to obtain a permit, the applicant must file a party permit application (the

---

**1.** In support of the Plaintiffs' Motion for Summary Judgment, Plaintiffs submitted: Plaintiffs' Brief in Support of Motion for Summary Judgment (the "Plaintiffs' Brief"); Declaration of Jeffrey E. Fogel, with Exhibits A through D attached (the "Fogel Decl."); Plaintiffs' Reply Brief and Appendix in Support of Motion for Summary Judgment (the "Plaintiffs' Reply").

In support of Defendants' Motion for Summary Judgment, Defendants submitted: Defendants' Brief in Support of Cross–Motion for Summary Judgment (the "Defendants' Brief").

**2.** This represents the terms of Section III of the Party Permit Ordinance given by both Plaintiffs and Defendants in their briefs. The text of the

"Party Permit Application") at least seven business days prior to the event, *see* Party Permit Ordinance § III(b), and provide the following information:

(1) The date, time and duration of the planned event;

(2) The name, address and telephone number of the applicant and/or person or entity responsible for planning, sponsoring, or otherwise organizing the event;

(3) The specific location of the anticipated event;

(4) The name and address of the owner of the premises and the telephone number at which such owner can be contacted and the written consent of the owner if other than the applicant; and

(5) The maximum number of persons anticipated to attend such event.

*See id.,* § III(a).

Within forty-eight hours of receipt of the Party Permit Application, the Party Permit Ordinance directs the City Clerk to "notify the Police Department for the purposes of verifying the information contained in the [Party Permit] [A]pplication and the Division of Inspections for the purposes of verifying that the proposed event is a permitted use under the Zoning Ordinance and that any structure where the event is to be held is adequate under existing codes for the intended use." Party Permit Ordinance, § III(c).

The Police Department and the Division of Inspections are required to "notify the City Clerk in writing within three (3) days of . . . approval or disapproval of [the Party Permit Application] ." *See* Party Permit Ordinance, § III(d). If either the Police Department or the Division of Inspections disapproves the Party Permit Application, it must furnish the disapproval in writing to the City Clerk. *See id.* The Clerk must then notify the applicant that the Party Permit Application has been denied and the basis for the denial. *See id.,*

§ III(f). Such disapproval is final under the Party Permit Ordinance. *See* Plaintiffs' Brief at 3.

If a Party Permit Application is approved by the Police Department and the Division of Inspections, the City Clerk issues a party permit, setting forth the date, beginning and ending time of the event, the premises on which the event is to be conducted, the maximum number of persons allowed, and the name of the applicant. *See* Party Permit Ordinance, § III(e). Upon issuance, New Brunswick must furnish a copy of the permit to the New Brunswick Police Department. *See id.,* § III(e).

An applicant must pay twenty dollars to process the Party Permit Application with the exception that "no fee [is] required from a bona fide non-profit organization having its principal place of business in [New Brunswick]." Party Permit Ordinance, § III(g).

The person or entity to whom a party permit is issued, and the owner or tenant of the premises on which such event is conducted are "jointly and severally responsible for the maintenance of good order and decorum on the premises during all hours that such event takes place." Party Permit Ordinance, § III(h). In addition, the Party Permit Ordinance provides "such responsible entity shall not permit any overly loud or boisterous conduct on such premises nor permit vehicles on streets in the area of such premises. All such persons shall obey the reasonable orders of any member of the police or fire departments of [New Brunswick] in order to maintain the public health, safety, and welfare." *Id.,* § III(h).

The Party Permit Ordinance further provides that any person or entity violating any of its terms and regulations shall be fined not less than one hundred and fifty dollars, and not more than one thousand dollars, or be

Party Permit Ordinance submitted by Plaintiffs, however, has a more limited scope and provides in part: "an anticipated gathering of fifty (50) or more persons for which an admission charge is collected or solicited for any purpose..." *See* Party Permit Ordinance, § III(a).

It is unclear whether Plaintiffs submitted an outdated or updated copy of the Party Permit

Ordinance. For the purposes of the two Motions for Summary Judgment, this difference in the statutory language is not dispositive and does not alter the opinion. The language cited by both Plaintiffs and Defendants in their briefs will be the language used in the remainder of this opinion.

imprisoned for a period not to exceed ten days. *See* Party Permit Ordinance, § III(i).

The Police Department is apparently permitted to set "special conditions" when a permit is accepted, although no provision for such conditions appears in the Party Permit Ordinance. *See* Plaintiffs' Brief at 5 (citing Party Permit No. 14 ("Party Permit 14"), issued 13 March 1997, attached to Fogel Decl. at Exhibit B). Below the City Clerk's signature, Party Permit No. 14 reads: "Special Conditions: Per Director Michael Beltranena, New Brunswick Police Department 2[two] extra duty police officers—2030—0300 hours—to be paid for in advance of event." *See* Party Permit No. 14.

#### 4. *Plaintiffs' Scheduled Events*

Plaintiffs are two non-profit organizations which argue their efforts to raise money and solicit contributions are directly affected by the Party Permit Ordinance. *See* Plaintiffs' Brief at 1. Plaintiffs planned a rally for 16 April 1997 at Rutgers University, where more than fifty people were expected to attend and where they expected to solicit contributions (the "16 April 1997 Event"). *See id.* at 5. By letter, dated 19 March 1997 (the "19 March 1997 Letter"), Plaintiffs' counsel advised Defendants' counsel of the planned event and that Plaintiffs' would be seeking a preliminary injunction against the Party Permit Ordinance in order to hold the 16 April 1997 Event without applying for a permit. *See id.;* 19 March 1997 Letter, attached to Fogel Decl. at Exhibit C.

On 2 April 1997, the City Council approved a set of written "Guidelines" for the administration of the Party Permit Ordinance (the "Guidelines"). *See* Guidelines, attached to Fogel Decl. at Exhibit D. The Guidelines state the purpose of the Party Permit Ordinance "is to provide advance notice of otherwise unexpected events by large groups of people. It is not to raise money, restrict people's activities or 'spy' on people who associate together." *See id.* The Guidelines state that the Party Permit Ordinance does not apply to: (1) groups of less than fifty; (2) events for which no charge is made or contribution solicited; (3) regularly scheduled activities by an entity conducting a licensed business at a single location owned or leased by the entity, such as restaurants and bars; (4) special events by an entity in support of its regular business or activity at a single location owned or leased by the entity, such as a school play or sports event; (5) purely religious or educational events even though admission fee collection or other charge is made, such as church services; or (6) events to be conducted on premises owned and operated by Rutgers University. *See id.*

As a result of the implementation of the Guidelines, a permit was not required for the 16 April 1997 Event. Plaintiffs, therefore, did not seek a party permit, nor did they seek a preliminary injunction. *See* Plaintiffs' Brief at 5.

### Discussion

#### A. *Summary Judgment Standard*

Plaintiffs and Defendants agree summary judgment is appropriate to resolve the present dispute. To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Kreimer v. Bureau of Police for the Town of Morristown,* 958 F.2d 1242, 1250 (3d Cir.1992). The present task is to determine whether genuine issues of material fact exist and whether Defendants are entitled to judgment as a matter of law. A district court may not resolve factual disputes in a motion for summary judgment. *Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir.1995) ("at the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' ") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party' ") (citations omitted).

In considering a motion for summary judgment, all evidence submitted must be viewed

in a light most favorable to the party opposing the motion. *Kowalski v. L & F Products,* 82 F.3d 1283, 1288 (3d Cir.1996); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County,* 970 F.2d 1260, 1265 (1992); *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 & n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

However, "the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *Gomez v. Allegheny Health Serv., Inc.,* 71 F.3d 1079, 1085 (3d Cir.1995), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996); *accord Siegel Transfer, Inc. v. Carrier Express, Inc. et al.,* 54 F.3d 1125, 1130–31 (3d Cir.1995); *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 534 (D.N.J.1989), *aff'd without op'n,* 899 F.2d 1218 (3d Cir.1990).

"The nonmoving party creates a genuine issue of material fact if [he or she] provides sufficient evidence to allow a reasonable jury to find for him at trial." *Brewer v. Quaker State Oil Refining Co.,* 72 F.3d 326, 330 (3d Cir.1995) (citations omitted). If the nonmovant fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Brewer,* 72 F.3d at 330; *Siegel,* 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or

where it is so overwhelming that it mandates judgment in favor of the movant").

**B. *Time, Place or Manner Restrictions***

■ It is not disputed Plaintiffs' activities are constitutionally protected. Solicitation of charitable contributions and dissemination of literature are forms of speech protected by the First Amendment. *See, e.g., International Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 677, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 789, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("solicitation of charitable contributions is protected speech"); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("charitable solicitation has been recognized by this Court as a form of protected speech"); *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("the oral and written dissemination of the Krishna's religious views and doctrines is protected by the First Amendment"); *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (charitable solicitations "involve a variety of speech interests ... that are within the protection of the First Amendment"); *United States v. Bjerke,* 796 F.2d 643, 646–47 (3d Cir.1986).

Local and state governments often seek to impose time, place or manner restrictions on speech by the use of licensing schemes, but an administrator's "net of control must not be cast too broadly." *Niemotko v. Maryland,* 340 U.S. 268, 282, 71 S.Ct. 325, 95 L.Ed. 267 (1951) (concurring); *see also Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (there are only a few "narrowly defined exceptions to the prohibition against prior restraints").

■ "Generally, speakers need not obtain a license to speak. However, that rule is not absolute. For example, States may impose valid time, place or manner restrictions." *Riley v. Nat'l Fed'n of Blind of N.C.,* 487 U.S. at 802, 108 S.Ct. 2667 (citing *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85

L.Ed. 1049 (1941)); *see R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Tacynec v. City of Philadelphia,* 687 F.2d 793, 797 (1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 819, 74 L.Ed.2d 1016 (1983). Even when a government may impose valid time, place or manner restrictions, these restrictions must (1) be "justified without reference to the content of the regulated speech," (2) be "narrowly tailored to serve a significant governmental interest," and (3) "leave open ample alternative channels for communication of the information."[3] *Ward v. Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. 2746 (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. 3065); *see United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)); *Heffron,* 452 U.S. at 648, 101 S.Ct. 2559; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

The Third Circuit explained the three prong standard in more detail in *Phillips v. Borough of Keyport,* 107 F.3d 164, 172 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 261 (1997):

> State regulations of speech that are not regarded as content neutral will be sustained only if they are shown to serve a compelling state interest in a manner which involves the least possible burden on expression. Regulations of speech that are regarded as content neutral, however, receive "intermediate" rather than this "exacting" or "strict" scrutiny.

**3.** Defendants argue the applicable standard to test the reasonableness of the Party Permit Ordinance is set out in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("a government regulation is sufficiently justified if it is within the constitutional power of the [g]overnment; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restrictions on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest").

In *Clark v. Community for Creative Non–Violence,* the Supreme Court observed that the

*Id.* (citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

### 1. Content–Neutrality

A decision on whether to grant a permit may not be based on the content of the speech. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (citing *Community for Creative Non–Violence,* 468 U.S. at 295, 104 S.Ct. 3065). An ordinance must have been adopted "without reference to the content of the regulated speech." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746; *see also Madsen v. Women's Health Center,* 512 U.S. 753, 763, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994); *R.A.V. v. St. Paul, Minn.,* 505 U.S. at 386, 112 S.Ct. 2538 ("[t]he government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed"); *Regan v. Time, Inc.,* 468 U.S. 641, 648–49, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 514–515, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality); *Carey v. Brown,* 447 U.S. 455, 466–68, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). If the purpose behind the regulation is unrelated to the content of the expression, the regulation will be deemed neutral even if it has an "incidental effect" on some speakers and not others. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (citing *Renton,* 475 U.S. at 47–48, 106 S.Ct. 925).

*O'Brien* test "in the last analysis is little, if any, different from the standard applied to time, place or manner restrictions." 468 U.S. 288, 298, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), *reh'g denied,* 492 U.S. 937, 110 S.Ct. 23, 106 L.Ed.2d 636 (1989). Thus, it is appropriate in the instant matter to use the three-prong standard applied to time, place or manner restrictions: content-neutrality, narrow tailoring, and alternative channels of communication. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746.

Plaintiffs argue the Party Permit Ordinance is not content-neutral because its requirements and restrictions are triggered when organizers of the event engage in fund-raising, a particular kind of speech. *See* Plaintiffs' Brief at 9.

Defendants concede Plaintiffs' activities of fund-raising and the dissemination of literature are protected by the First Amendment, *see* Defendants' Brief at 3, but they argue the Party Permit Ordinance does not attempt to control or limit expressive conduct or fund-raising. *See id.* Instead, Defendants argue the Party Permit Ordinance regulates large gatherings of people, based upon the assumption that such gatherings often lead to fighting, boisterous behavior and other disturbances. *See id.* at 7. Defendants assert the Party Permit Ordinance is content-neutral because their intent in enforcing it has nothing to do with the suppression of ideas or free speech. *See id.* at 4.

Defendants point to the decisions in *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) and *Community for Creative Non–Violence,* 468 U.S. at 288, 104 S.Ct. 3065, to argue the Party Permit Ordinance should be analyzed as a content-neutral regulation with only incidental effects on expressive activity. Defendants' reliance on these cases is misplaced.

In *Stanglin,* the Court held that a city ordinance could limit minors' access to dance halls. The Court observed a possible "kernel of expression," which could be found in any activity, is not enough to bring the activity under the protection of the First Amendment. *See Stanglin,* 490 U.S. at 25, 109 S.Ct. 1591. *Stanglin* concluded the minors' activities are outside the purview of the First Amendment, and reviewed the ordinance under an equal protection analysis. *See id.* In *Stanglin,* there was no discussion of valid time, place or manner restrictions; moreover, there was no mention of what constitutes content-neutrality.

As discussed, there is no dispute that Plaintiffs' activities of fund-raising and disseminating literature consist of more than a "kernel of expression." The instant case is governed by the line of cases discussing time, place or manner restrictions, and not by cases reviewing restrictions under an equal protection analysis.

In *Community for Creative Non–Violence,* the Supreme Court discussed time, place or manner restrictions, and held that a regulation preventing sleeping in tents in the Mall was neutral with regard to the message presented. 468 U.S. at 295, 104 S.Ct. 3065. The Supreme Court did not specifically determine the ordinance was content-neutral, but rather relied on the District Court opinion and noted the parties did not dispute content-neutrality. *See id.* In short, the ordinance in *Community for Creative Non–Violence,* limited camping, including sleeping activities, to designated campgrounds, but made no distinctions between campers or camping activities. The Party Permit Ordinance, in contrast, makes distinctions between the two kinds of events with fifty persons or more—those which collect admission and solicit funds, and those which do not.

In essence, Defendants argue the Party Permit Ordinance is content-neutral because the interest in reducing noise and boisterous behavior is unrelated to the content distinctions between the two types of events. This reasoning was found to be unpersuasive in *City of Cincinnati v. Discovery Network,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

The ordinance in *Discovery Network* revoked permits allowing publishers to distribute their commercial publications through freestanding newsracks on public property. *See Discovery Network,* 507 U.S. at 412, 113 S.Ct. 1505. Although *Discovery Network* addressed limitations on commercial speech, the discussion of time, place or manner restrictions is instructive for the instant matter.

In *Discovery Network,* the Court observed "the very basis for the regulation [prohibiting distribution of commercial handbills on public property] is the difference in content between ordinary newspapers and commercial speech." *Discovery Network,* 507 U.S. at 429; *see also Carey v. Brown,* 447 U.S. at 461, 100 S.Ct. 2286 ("[t]he permissibility of residential picketing under the Illinois stat-

ute [permitting "peaceful" labor picketing but not non-labor picketing] is . . . dependent solely on the nature of the message being conveyed").

In *Discovery Network,* the Court rejected the city's argument that the ordinance in question was content-neutral because there was no evidence the city had acted with animus when it banned the use of newsracks distributing commercial handbills but not newspapers. *See id.,* 507 U.S. at 429, 113 S.Ct. 1505. The Court then reiterated its finding in an earlier case explicitly rejecting the argument that "discriminatory . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas." *Id.* (quoting *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,* 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)).

The Court in *Discovery Network* reviewed the ban on the use of newsracks that distribute commercial handbills without much deference to the city's intent in enacting the ordinance. The Court observed:

> Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is "content-based."

*Id.* at 429, 113 S.Ct. 1505.

In the instant case, regardless of New Brunswick's asserted interests or intent, the determination of whether an organizer or group is required to apply for a permit before staging an event is dependent solely upon the size of the event and whether or not the organizer plans to charge admission or solicit funds. The restrictions of the Party Permit Ordinance, therefore, depend upon whether the individual or group plans to participate in fund-raising, which has been determined to be constitutionally protected speech. *See, e.g., International Soc'y for Krishna Consciousness,* 505 U.S. at 677, 112 S.Ct. 2701; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. at 789, 108 S.Ct. 2667; *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. at 797, 105 S.Ct. 3439; *Citizens for a Better Env't,* 444

U.S. at 632, 100 S.Ct. 826. It appears there is no justification for New Brunswick's distinction between these two types of events other than the assertion that the "findings set forth in the [Party Permit] Ordinance expressly target the secondary effects, i.e., noise and boisterous behavior, which were found to be related to large gatherings." Defendants' Brief at 7.

■ As the Court stated in *Discovery Network,* "[i]t is the absence of a neutral justification for its selective ban on newsracks that prevents the city from defending its newsrack policy as content neutral." *Id.,* 507 U.S. at 429–30, 113 S.Ct. 1505. In the instant matter, Defendants have not put forth any argument suggesting events raising money through admission or solicitation are more likely to be noisy and boisterous. Defendants fail to provide a neutral justification for the restrictions on certain types of events.

The Guidelines lend further support to Plaintiffs' charge that the Party Permit Ordinance is not content-neutral. The Guidelines maintain the distinctions created in the Party Permit Ordinance, and create further distinctions by excluding several types of events from the permit requirement, including "purely educational and religious events," and events conducted on the premises of Rutgers University. *See* Guidelines. Therefore, with the addition of the Guidelines for the administration of the Party Permit Ordinance, the City Council maintained the content-based distinctions between events which solicit funds and charge admissions and events which do not. The Guidelines also created new content-based distinctions between events not listed in the Guidelines, and, *inter alia,* "purely educational or religious events," and events conducted on the premises of Rutgers.

It is, once again, difficult to determine how the distinctions made in the Guidelines relate to the city's justification of reducing noise and boisterous behavior at large gatherings. It is possible, if not probable, Defendants enacted the Guidelines in order to prevent the instant suit by Plaintiffs, whose event was scheduled at Rutgers University, and to exclude certain events such as church ser-

vices, bingo games, and some sports events that otherwise would be covered under the Party Permit Ordinance. By enacting the Guidelines, however, Defendants created further impermissible distinctions between different types of events. To name only one impermissible distinction, New Brunswick requires a party permit for an event that is not "purely religious." The same size event, in the same place, with the same people, with the same amount of noise and boisterous behavior, as long as the content of the event is "purely religious," is excused from obtaining a party permit. For this reason, and for all the reasons stated above, the Party Permit Ordinance is not content-neutral.

■ As discussed, once an ordinance is found not to be content-neutral, it can be upheld only if it is found to serve a compelling state interest in a manner which involves the least possible burden on expression. *See Phillips*, 107 F.3d at 172. The following discussion addressing the last two prongs of the test for time, place or manner restrictions, therefore, is a more thorough review of the Party Permit Ordinance than would be mandated by prior case law. The Party Permit Ordinance fails an "intermediate" standard of review, and by necessary implication, fails an "exacting" or "strict scrutiny" review.

### 2. *"Narrowly Tailored" Requirement*

■ The second inquiry of time, place or manner restrictions is whether the Party Permit Ordinance is "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 791, 109 S.Ct. 2746 (quoting *Community for Creative Non–Violence*, 468 U.S. at 293, 104 S.Ct. 3065); *see also Citizens for a Better Env't*, 444 U.S. 620 at 637, 100 S.Ct. 826 ("[t]he Village [of Schaumburg] may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms"). Narrow tailoring must be interpreted as "promot[ing] a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (*quot-*

*ing United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

■ A government regulation of time, place or manner of speech must be narrowly tailored, but this does not imply a requirement that the regulation be "the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798, 109 S.Ct. 2746; *see Community for Creative Non–Violence*, 468 U.S. at 297, 104 S.Ct. 3065. "[R]estrictions on the time, place or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Ward*, 491 U.S. at 797, 109 S.Ct. 2746 (quoting *United States v. Albertini*, 472 U.S. at 689, 105 S.Ct. 2897).

■ The "narrowly tailored" standard, while not requiring a regulation to be the *least restrictive* or *least intrusive* means of promoting the asserted interest, still requires a "reasonable fit between [the government's] legitimate interests" and "the means chosen to serve those interests." *Discovery Network*, 507 U.S. at 416, 113 S.Ct. 1505; *see also Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (the rejection of the least restrictive means test for time, place or manner regulations "does not mean that a ... regulation may burden substantially more speech than is necessary to further the government's legitimate interests"). As the Third Circuit explained:

> While the requirement of narrow tailoring does not mean that the ordinance must be the least restrictive means of serving the Borough's substantial interests, "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. at 799, 109 S.Ct. 2746.

*Phillips*, 107 F.3d at 174; *see also U.S. Sound & Service, Inc. v. Tp. of Brick*, 126 F.3d 555, 558–59 (3d Cir.1997).

■ New Brunswick asserts its interest in requiring a party permit for certain events is to abate noise, to receive "advance notice of otherwise unexpected events by large groups of people," *see* Guidelines, and to avert fighting, boisterous behavior and "oth-

er activities which adversely affect the quality of life in [New Brunswick] neighborhoods." *See* Party Permit Ordinance, § I(i). New Brunswick has a significant interest in protecting its residents from noise, fighting, boisterous behavior and other disturbances which affect the quality of life. *See Ward,* 491 U.S. at 792, 109 S.Ct. 2746; *Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 806, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (a municipality has "a substantial interest in protecting its citizens from unwelcome noise"); *Cox v. Louisiana,* 379 U.S. 559, 562, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *Mitchell v. Commission on Adult Entertainment Establishments of the State of Del.,* 10 F.3d 123, 133 (3d Cir.1993) ("a state's interest in preserving the character and preventing the deterioration of its neighborhoods adequately supports restrictions on adult entertainment establishments").

Plaintiffs concede that knowing where and when large parties are to occur may help police anticipate where noise or other disturbances may arise, but they argue the Party Permit Ordinance is not narrowly tailored to achieve New Brunswick's asserted interest. *See* Plaintiffs' Brief at 10. Plaintiffs argue the events requiring a Party Permit, namely events where admission is charged or a contribution is solicited for any reason, are no more likely to cause noise or boisterous behavior than events in which no admission is charged or contributions solicited. *See id.*

The distinction between the two types of events in the Party Permit Ordinance is not an acceptable means of advancing New Brunswick's legitimate interest in preventing excessive noise and boisterous behavior. The Supreme Court has often struck down ordinances where the distinction between two types of speech or expression is unrelated, or only tangentially related, to the interest asserted by the government. *Cf. Discovery Network,* 507 U.S. at 424, 113 S.Ct. 1505 ("[n]ot only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship whatsoever to the particular interests that the city has asserted"); *Carey v. Brown,* 447

U.S. at 465, 100 S.Ct. 2286 (statute permitting labor picketing but not non-labor picketing could not be sustained when "nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on [the government's asserted interest of] privacy"); *Citizens for a Better Env't,* 444 U.S. at 636, 100 S.Ct. 826 (requirement that charitable solicitors use seventy-five percent of funds collected for charitable purposes only "peripherally promoted" the city's interest in "protecting the public from fraud, crime and undue annoyance").

There is no language in either the Party Permit Ordinance or in the Guidelines directly addressing New Brunswick's concerns with noise and boisterous behavior, except for a provision in section III(h) of the Party Permit Ordinance which directs the "responsible entity [to] not permit any overly loud or boisterous conduct on such premises nor permit vehicles on streets in the area of such premises." *See* Party Permit Ordinance, § III(h).

■ A court may not strike down a regulation simply because it disagrees with the municipality on the most appropriate means to achieve its legitimate interests. *See Ward,* 491 U.S. at 800, 109 S.Ct. 2746. In the instant matter, however, it is difficult to discern any logical relationship between New Brunswick's asserted interests in reducing noise and boisterous behavior, and the distinctions made in the Party Permit Ordinance. Like the ordinance in *Citizens for a Better Environment,* New Brunswick's interests are only "peripherally promoted" by requiring organizations which are planning an event at which admission will be charged or contributions solicited to apply for a party permit beforehand. *See Citizens for a Better Env't,* 444 U.S. at 635–37, 100 S.Ct. 826. The Party Permit Ordinance has no affect on an event, no matter how large, how loud, or how boisterous, as long as no admission is charged, or as long as it is, *inter alia,* a "purely religious or educational event." *See Guidelines.*

■ It is not apparent that the solicitation of contributions or charging of an admission, either of which triggers the application of the Party Permit Ordinance, creates

a greater problem of noise and other disturbances than do those events where no admission is charged and where no funds are solicited. The Party Permit Ordinance, therefore, is not "narrowly tailored to serve a significant governmental interest." See Ward, 491 U.S. at 791, 109 S.Ct. 2746.

### 3. Alternative Channels for Communication

Inexplicably, neither Plaintiffs nor Defendants addressed the third prong of an inquiry into time, place or manner restrictions—whether the Party Permit Ordinance leaves open alternative channels for communication. Because the Party Permit Ordinance is neither content-neutral nor narrowly tailored, it is not necessary to investigate whether the Party Permit Ordinance leaves open alternative channels for communication. Nevertheless, this is the only prong of the test for time, place or manner restrictions the Party Permit Ordinance does not violate.

There is a requirement for time, place or manner restrictions to provide ample alternative channels for communication. See Ward, 491 U.S. at 791, 109 S.Ct. 2746; Heffron, 452 U.S. at 654, 101 S.Ct. 2559; Rappa v. New Castle County, 18 F.3d 1043, 1065 (3d Cir. 1994); see also Community for Creative Non–Violence, 468 U.S. at 295, 104 S.Ct. 3065 (regulation prohibiting overnight sleeping in the Mall did not restrict advocates for the homeless from communicating their message in other ways); Taxpayers for Vincent, 466 U.S. at 812, 104 S.Ct. 2118 (an ordinance prohibiting posting of signs on public property left open ample alternative modes of communication).

The Court has construed the "alternative channels for communication" requirement to only require that a government provide a "reasonable opportunity" to make the communication somewhere within the municipality. See Renton, 475 U.S. at 54, 106 S.Ct. 925 ("[i]n our view, the First Amendment requires only that [the city] refrain from effectively denying respondents a reasonable opportunity to operate an adult theater in the city").

■ Alternative channels for communication remain despite the restrictions of the Party Permit Ordinance. The communication that Plaintiffs wish to express in the community can be done in many ways other than raising money at events at which fifty or more people are expected. For example, Plaintiffs can solicit money and advocate their message through the mail and in person without being bound by the Party Permit Ordinance. The Party Permit Ordinance, therefore, leaves open ample alternative channels for communication. The Party Permit Ordinance, however, is invalid as a time, place or manner restriction because it is not content-neutral or narrowly tailored.

### A. The Overbreadth Doctrine

Plaintiffs also mount a facial challenge to the Party Permit Ordinance. As part of their facial challenge, Plaintiffs argue the Party Permit Ordinance lacks procedural safeguards and adequate standards to limit discretion of public officials. See Plaintiffs' Brief at 12, 14.

### 1. Legal Standard

■ The overbreadth doctrine is an exception to the general rules of standing, and provides "[a]n overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." Forsyth County v. Nationalist Movement, 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); see also Citizens for a Better Envt., 444 U.S. at 634, 100 S.Ct. 826 ("[g]iven a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court"); Taxpayers for Vincent, 466 U.S. at 798–99 & n. 15, 104 S.Ct. 2118; Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987).

The rationale of the overbreadth doctrine is that an overbroad ordinance "creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, ...

and in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Forsyth County,* 505 U.S. at 129–30, 112 S.Ct. 2395 (citations omitted).

The overbreadth doctrine was created "in appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Forsyth County,* 505 U.S. at 129, 112 S.Ct. 2395 (citing *New York v. Ferber,* 458 U.S. 747, 772, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Brockett v. Spokane Arcades,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)); *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (there is a "judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression").

 The overbreadth doctrine requires a statute to be substantially overbroad before the doctrine will be invoked. As the Supreme court explained:

> [P]articularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

*Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908.

### 2. Discretion of Public Officials

 The power to deny the use of a forum in advance of actual expression must be subject to "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth v. Alabama,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *see also Niemotko,* 340 U.S. at 271, 71 S.Ct. 325. An ordinance allowing "arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth County,* 505 U.S. at 130–31, 112 S.Ct. 2395 (quoting *Heffron,* 452 U.S. at 649, 101 S.Ct. 2559); *see also Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Kunz v. New York,* 340 U.S. 290, 294, 71

S.Ct. 312, 95 L.Ed. 280 (1951); *Niemotko,* 340 U.S. at 268, 71 S.Ct. 325; *Saia v. New York,* 334 U.S. 558, 560, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948).

As the Court explained:

> [T]he absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*Lakewood,* 486 U.S. at 758, 108 S.Ct. 2138.

 The doctrine preventing unbridled discretion "requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Id.* at 770, 108 S.Ct. 2138. A court, therefore, may not write limitations into a silent statute in order to make it constitutionally acceptable. *See id.*

 In evaluating the Party Permit Ordinance, New Brunswick's "authoritative constructions of the ordinance, including its own implementation and interpretation of it[,]" must be considered. *Forsyth County,* 505 U.S. at 131, 112 S.Ct. 2395 (citing *Ward,* 491 U.S. at 795–96, 109 S.Ct. 2746). Defendants assert:

> "Section III(c) ... vests approval authority only with the Police Department and the Division of Inspections. The former only verifies if the information on the application is true. The latter only verifies that the proposed event is a permitted use and that any structure can safely accommodate the event."

Defendants' Brief at 14.

The plain language of the Party Permit Ordinance, at first glance, is consistent with

Defendants' interpretation. The Party Permit Ordinance directs the City Clerk to "notify the Police Department for the purposes of verifying the information contained in the [Party Permit] [A]pplication and the Division of Inspections for the purposes of verifying that the proposed event is a permitted use." Party Permit Ordinance, § III(c). The phrase "for the purposes of verifying," implies the Police Department and Division of Inspections have limited authority to deny and accept Party Permit Applications.

Plaintiffs argue the Police Department's authority is improper by relying upon *Lakewood. See* Plaintiffs' Brief at 14. The ordinance in *Lakewood* authorized the mayor to grant or deny applications submitted by publishers for annual newsrack permits. If the application for a permit was denied, the mayor was required to "stat[e] the reasons for such denial." 486 U.S. at 753, 108 S.Ct. 2138. If the application was granted, the permit was subject to, *inter alia*, any "terms and conditions deemed necessary and reasonable by the Mayor." *Id.*, 486 U.S. at 753–54, 108 S.Ct. 2138. The Court held the ordinance unconstitutional because there were "no explicit limits in the mayor's discretion." *Id.*, 486 U.S. at 769. The city of Lakewood asked the Court to presume the Mayor would act in good faith, but the Court observed "this is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.*, 486 U.S. at 770.

At first glance, Plaintiffs' suggestion that the Party Permit Ordinance lacks discretion similar to the ordinance in *Lakewood* is not consistent with the limitations in the Party Permit Ordinance, or with Defendants' interpretation of the Party Permit Ordinance. On closer examination, the limitations in the Party Permit Ordinance are not as explicit as Defendants suggest.

Defendants' construction of the Party Permit Ordinance is not consistent with the Police Department's ability to impose "special conditions," such as requiring the provision of two extra duty police officers in Party Permit No. 14. The Police Department in that instance was not only verifying if the information on the application is true; rather, the Police Department determined extra officers would be required for the event. While the requirement of two extra-duty police officers does not in itself suggest Defendants are discriminating against disfavored speech, it does bring into question the Defendants' interpretation of the role of the Police Department and the Division of Inspections in accepting or denying party permits. The ability to impose "special conditions" on party permit applicants renders unclear the limits actually placed on the authority of the Police Department to set conditions or deny permits.

■ This discussion does not suggest Defendants had evil intent when they delegated this discretion to the Police Department and Division of Inspections. Like the permit in *Lakewood,* however, the presumption that the Police Department and Division of Inspections will act in good faith is not a permissible limitation on authority. The Party Permit Ordinance, therefore, does not adequately limit the discretion of the licensing authorities.

### D. *Vagueness*

■ Plaintiffs argue the Party Permit Ordinance violates due process and the First Amendment because it is vague. *See* Plaintiffs' Brief at 16. There is a general requirement that a law give notice as to precisely what activity is made criminal. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined"); *see also Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (invalidated statute requiring persons who loitered or wandered the streets to produce for police officers "credible and reliable" identification and account for their presence.); *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (upheld statute requiring a business to obtain a license if it sells items "designed or marketed for use with illegal drugs"), *reh'g denied,* 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982); *Trade Waste Management Ass'n, Inc. v. Hughey,* 780 F.2d 221, 235 (3d Cir. 1985); *Pringle v. Court of Common Pleas,*

778 F.2d 998, 1001 (3d Cir.1985). As the court in *Grayned* explained:

> Vague laws offend several important values. First, because we assume that [a person] is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [the] police[ ], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut(s) upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of (those) freedoms." Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked."

*Grayned*, 408 U.S. at 108–109, 92 S.Ct. 2294 (citations omitted).

The void for vagueness doctrine was "originally constructed to invalidate penal statutes that do not 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited,' [but] courts have transplanted this due process principle into the First Amendment setting." *Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d at 1266 (quoting *Kolender v. Lawson*, 461 U.S. at 357, 103 S.Ct. 1855; *see also Pringle*, 778 F.2d at 1001; *Montgomery Nat'l Bank v. Clarke*, 882 F.2d 87, 89 (3d Cir.1989).

A law can be void for vagueness, therefore, when there is a lack of clear guidelines for law enforcement officers. *See Kolender v. Lawson*, 461 U.S. at 359–62, 103 S.Ct. 1855 (statute "failed to describe with specific particularity" what a person on the street must do to satisfy requirement of producing "credible and reliable information"). Also, a law can be void for vagueness when the lack of notice might deter the exercise of a fundamental constitutional right, including rights under the First Amendment. *See Colautti v. Franklin*, 439 U.S. 379, 390–91, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (statutes may be void for vagueness especially "where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights"); *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (government regulation affecting First Amendment rights must be tolerated with "narrow specificity"). There is tolerance for a higher degree of vagueness when an ordinance provides for civil rather than criminal penalties. *See Hoffman Estates*, 455 U.S. at 498–99, 102 S.Ct. 1186; *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir.), *cert. denied*, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992); *Kreimer*, 958 F.2d at 1267.

The void-for-vagueness doctrine overlaps with the overbreadth doctrine. The Third Circuit has observed:

> Like the overbreadth doctrine, a meritorious First Amendment vagueness challenge will annul an unclear law that 'chills' protected First Amendment activities. Hence, a vagueness challenge will succeed when a party does not have actual notice of what activity the statute prohibits. Yet the vagueness doctrine, unlike the overbreadth doctrine, additionally seeks to ensure fair and non-discriminatory application of the laws, thus reflecting its roots in the due process clause.

*Kreimer*, 958 F.2d at 1266 (citing *Kolender v. Lawson*, 461 U.S. at 357–58, 103 S.Ct. 1855); *see also San Filippo*, 961 F.2d at 1135 n. 14.

Plaintiffs argue several sections of the Party Permit Ordinance leave a citizen of ordinary intelligence guessing as to their meaning, which they contend may lead to arbitrary and discriminatory enforcement of the Party Permit Ordinance. *See* Plaintiffs' Brief at 16–17. Specifically, Plaintiffs point to undefined terms in the Party Permit Ordinance such as "party, festival or other similar event," and "purely religious and educational events." *See id.* Also, the Party Permit Ordinance holds the "responsible entities" jointly and severally responsible for

the maintenance of good order and decorum during the course of the event. *See id.* at 17.

Plaintiffs submitted the deposition testimony of Beltranena, the police chief, to demonstrate the ambiguity of the Party Permit Ordinance and the lack of clear guidelines for law enforcement officers. *See* Deposition of Beltranena (the "Beltranena Dep."), attached to Plaintiffs' Reply. Beltranena testified it was not clear to him whether a permit would be required for an event at which a charitable donation is solicited for a third party, as opposed to the applicant. *See id.,* at 43–45. Beltranena's testimony was as follows:

Q. In the circumstances that I just described to you the birthday party for a three-year old, where the parents expect to solicit a contribution for the purpose of making a donation to the March of Dimes and it is expected that more than fifty people will be present. That would appear to require an application and a permit from the City of New Brunswick to conduct that event, is that correct?

A. There would be a question I would have on that, yes. And I would seek legal counsel before I would proceed with that.

Q. And the reason you would have a question about that is why?

A. Because who's soliciting at that point?

Q. Now would you explain to me why the question of who is soliciting and the point at which they're soliciting has any applicability to determine whether or not they must apply for an receive a permit in order to hold that event?

A. Because I would not understand that. I wouldn't understand that, the mechanics of that situation.

Q. Let's go back to the ordinance for a second.

A. Okay.

Q. Now, the ordinance requires does it not, that any entity organizing ... a party, festival or other similar event involving an anticipated gathering of fifty or more persons for which an admission charge is collected or solicited for any purpose, shall hold such—any such event without first applying for a permit.

A. For which an admission charge is collected or solicited for any purpose.

Q. Right.

A. In other words, if they are soliciting a donations for a gift or they are soliciting a donation for an admission charge? That would be the question that I would have to ask legal counsel in the case you've just presented.

In addition, Beltranena testified he does not believe a permit would be required if the solicitation were to cover the cost of the event or if the event were to be held on public property. *See* Beltranena Dep. at 65, 97–98. Beltranena does believe, however, an indoor event would require a permit. *See id.* at 99. Beltranena further testified he has no guidelines explaining what constitutes an educational or religious event. *See id.* at 101.

Beltranena's attempted interpretation of the Party Permit Ordinance demonstrates the lack of clear guidelines for law enforcement officers. While Beltranena reads various limitations into the Party Permit Ordinance, and excludes several events from permit requirements, there is no such language in the Party Permit Ordinance to support his interpretation.

The Party Permit Ordinance simply states, as set forth above, that no person or entity planning an event for more than fifty persons in which an admission will be charged or funds solicited may hold the event without first applying for a party permit. *See* Party Permit Ordinance, § III. The Guidelines, enacted after the Party Permit Ordinance, exclude some events from the requirements of the Party Permit Ordinance. Beltranena explained, however, that several other types of events not mentioned in either the Guidelines or the Party Permit Ordinance are excluded from the Party Permit Ordinance.

When Beltranena's testimony is considered, it is apparent that the Party Permit Ordinance contains a lack of clear guidelines for law enforcement officers. Beltranena's testimony demonstrates the Police Department may enforce the Party Permit Ordinance on a selective basis, requiring some groups to apply for a permit and other groups to escape its restrictions.

■ The Party Permit Ordinance violates both due process and the First Amendment. Beltranena's testimony shows there is a lack of clear guidelines for law enforcement officers. Also, as is demonstrated by Beltranena's testimony, the terms of the Party Permit Ordinance are sufficiently vague that a person of ordinary intelligence would not know when he or she was in violation of it. The Party Permit Ordinance, therefore, is void for vagueness.

*State Law Causes of Action*

Plaintiffs' third cause of action, Count Three, seeks a determination that the Party Permit Ordinance violates Article I, ¶¶ 1, 6 and 18 of the New Jersey Constitution. Supplemental jurisdiction enables Federal courts to hear state law claims over which there is no independent basis of jurisdiction. *See* 28 U.S.C. § 1367; *Lee–Patterson v. New Jersey Transit Bus Operations, Inc.,* 957 F.Supp. 1391, 1403–04 (D.N.J.1997) (citing *Carnegie Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). Supplemental jurisdiction depends upon the existence of subject matter jurisdiction over other claims in the action. Section 1367(a) of Title 28 ("Section 1367"), provides, in pertinent part:

> "[I]n any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy...."

*Id.; see also Sinclair v. Soniform, Inc.,* 935 F.2d 599, 603 (3d Cir.1991).

Section 1367(c) permits a court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." Section 1367(c); *see also Carnegie–Mellon v. Cohill,* 484 U.S. at 350, 108 S.Ct. 614 (1988) ("when the [F]ederal-law claims have dropped out of the lawsuit in its early stages and only the state-law claims remain, the [F]ederal court should decline the exercise of jurisdiction by dismissing the case without prejudice") (footnote omitted); *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 198 n.

3 (3d Cir.1991); *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1285 & n. 14 (3d Cir.1993); *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 198 n. 3 (3d Cir. 1991); *Green v. City of Paterson,* 971 F.Supp. 891, 909 n. 10 (D.N.J.1997); *Lee–Patterson v. New Jersey Transit Bus Operations, Inc.,* 957 F.Supp. at 1404 (D.N.J.1997).

As discussed, summary judgment has been granted to Plaintiffs on the claims raised under the First and Fourteenth Amendments to the United States Constitution. Because no other ground for supplemental jurisdiction is alleged, the Third Cause of Action is dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

*Conclusion*

For the reasons set forth, Plaintiffs' Motion for Summary Judgment is granted and Defendants' Motion for Summary Judgment is denied. Specifically, Plaintiffs are entitled to summary judgment on the First and Second Counts of the Complaint, alleging the Party Permit Ordinance violates the First and Fourteenth Amendments to the United States Constitution.